Filed 5/19/23  P. v. Mora CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAIME MORA,<br><br>    Defendant and Appellant. | F083057<br><br>(Super. Ct. No. BF178339A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In 2019, defendant Jaime Mora was arrested after Jane Doe 1, a family member who was then 16 years old, disclosed that defendant had molested her between the ages of four and eight years old.[1] Based on events between 2007 and 2012 involving Jane Doe 1, defendant was charged with oral copulation of a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b); count 1), sexual penetration of a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b); count 2), and continuous sexual abuse of a child under the age of 14 years (Pen. Code, § 288.5, subd. (a); count 3). Based on events in 2001 involving another family member, Jane Doe 2, defendant was charged with committing a lewd or lascivious act upon a child 14 or 15 years of age who is at least 10 years younger. (Pen. Code, § 288, subd. (c)(1); count 4).)

In 2021, defendant was convicted by jury on counts 1 through 3, but the jury was unable to reach a unanimous verdict on count 4 and the trial court declared a mistrial. The court sentenced defendant to mandatory terms of 15 years to life on count 1 and count 2, to run consecutively, and to a concurrent middle term of 12 years on count 3.

Defendant filed a timely notice of appeal. He challenges the trial court's denial of his three *Batson/Wheeler*[2] motions, brought following the prosecutor's use of allegedly race-based peremptory challenges to excuse jurors P.S., D.M., and T.S. Defendant claims that the trial court's failure to adhere to the parameters in Assembly Bill No. 3070[3] resulted in a violation of his constitutional rights, and that he is also entitled to

---

[1]  This appeal is limited to defendant's challenge to jury selection and, therefore, we need not further summarize the facts underlying his convictions.

[2]  *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[3]  Assembly Bill No. 3070 (2019–2020 Reg. Sess.) (Assembly Bill 3070 or Assem. Bill 3070).

reversal of his convictions under a traditional *Batson/Wheeler* analysis. The People dispute any entitlement to relief.

As explained herein, we do not evaluate defendant's claim of error under Assembly Bill 3070 because it applies, by its express terms, only to jury selections beginning on or after January 1, 2022. We find no error under *Batson/Wheeler* and, therefore, we affirm the judgment.

## DISCUSSION

### I.  Legal Principles Applicable to *Batson/Wheeler* Claims

We begin with the well-established standards governing *Batson/Wheeler* claims. Trial courts have broad discretion over jury selection (*People v. Whalen* (2013) 56 Cal.4th 1, 29–30, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17; *People v. Lenix* (2008) 44 Cal.4th 602, 608 (*Lenix*)), and peremptory challenges to excuse potential jurors "are 'designed to be used "for any reason, or no reason at all"'" (*People v. Armstrong* (2019) 6 Cal.5th 735, 765 (*Armstrong*), quoting *People v. Scott* (2015) 61 Cal.4th 363, 387). "But there are limits: Peremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender. [Citations.] Such use of peremptory challenges violates both a defendant's right to a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution, and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*Armstrong, supra*, at pp. 765–766.) "[R]ace is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges" and where, as here, the defendant and the excused jurors do not share the same racial identity, a *Batson/Wheeler* challenge may still be raised. (*Powers v. Ohio* (1991) 499 U.S. 400, 416; accord, *People v. Parker* (2017) 2 Cal.5th 1184, 1212; *People v. Burgener* (2003) 29 Cal.4th 833, 863.)

With respect to jury selection, "'[t]here "is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing

3.

party to demonstrate impermissible discrimination.'" [Citations.] Under a now familiar three-step process, a defendant [bringing a *Batson/Wheeler* motion] must first 'make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination."' [Citations.] … The defendant's ultimate burden is to demonstrate that 'it was more likely than not that the challenge was improperly motivated.'" (*Armstrong, supra*, 6 Cal.5th at p. 766; accord, *People v. Parker, supra*, 2 Cal.5th at p. 1211; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158–1159 (*Gutierrez*).)

## II.    Changes to Jury Selection Procedure Under Assembly Bill 3070

As an initial matter, defendant claims that he is entitled to reversal of his convictions because "the [trial] court's refusal to adopt the parameters for jury selection set forth in Assembly Bill No. 3070 failed to preserve [his] constitutional rights to due process, equal protection, and to trial by a fair, impartial, and representative jury." In response to the People's contention that Assembly Bill 3070 is not retroactive and the new requirements codified in Code of Civil Procedure section 231.7[4] apply to jury selection beginning on or after January 1, 2022, defendant asserts that he "is not arguing the trial court was legislatively required to conduct jury selection according to the dictates of [Assembly Bill] 3070, but rather that the court erred in refusing to use a racially neutral jury selection process." (Italics omitted.) In effect, however, defendant is requesting that we review the excusal of P.S., D.M., and T.S. through the lens of section

---

[4]    All further statutory references are to the Code of Civil Procedure unless otherwise specified.

231.7, prior to the date the Legislature deemed the new procedures applicable to jury selection.  For the following reason, we decline to do so.

In 2020, the Legislature acted to reform the law as it pertains to the use of peremptory challenges in jury selection through the enactment of Assembly Bill 3070. The Legislature expressly found that "peremptory challenges are frequently used in criminal cases to exclude potential jurors from serving based on their race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, and that exclusion from jury service has disproportionately harmed African Americans, Latinos, and other people of color." (Legis. Counsel's Dig., Assem. Bill 3070, Summary Dig., p. 2, § 1, subd. (b).)  Further, "the existing procedure for determining whether a peremptory challenge was exercised on the basis of a legally impermissible reason has failed to eliminate that discrimination." (*Ibid.*)  Therefore, the bill, which added section 231.7, "designates several justifications as presumptively invalid and provides a remedy for both conscious and unconscious bias in the use of peremptory challenges."  (Legis. Counsel's Dig., Assem. Bill 3070, Summary Dig., p. 2, § 1, subd. (b).)

As related to our *Batson/Wheeler* discussion below, "[e]xpressing a distrust of or having a negative experience with law enforcement or the criminal legal system," "[h]aving a close relationship with people who have been stopped, arrested, or convicted of a crime," "[d]ress, attire, or personal appearance," or "[*a*]*ny* justification that is similarly applicable to a questioned prospective juror or jurors, who are not members of the same cognizable group as the challenged prospective juror, but were not the subject of a peremptory challenge by that party" are among the reasons "presumed to be invalid." (§ 231.7, subd. (e)(1), (3), (9), (13).)  To pass scrutiny under Assembly Bill 3070, "the party exercising the peremptory challenge [must] show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national

5.

origin, or religious affiliation, or perceived membership in any of those groups, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (§ 231.7, subd. (e).)

The changes to the law under Assembly Bill 3070 do not apply in this case, however. (*People v. Battle* (2021) 11 Cal.5th 749, 776, fn. 9 ["Assembly Bill No. 3070 has not yet taken effect (Code Civ. Proc., § 231.7, subd. (i)), so it offers us no occasion to revisit … our *Batson/Wheeler* jurisprudence more broadly."]; *People v. Silas* (2021) 68 Cal.App.5th 1057, 1102.) The Governor signed the bill into law on September 30, 2020, and "[e]xcept when passed as an urgency measure, a statute enacted at a regular session of the Legislature generally becomes effective on January 1 of the year following its enactment." (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341, citing Cal. Const., art. IV, § 8, subd. (c) & Gov. Code, § 9600, subd. (a).) Thus, Assembly Bill 3070 was effective on January 1, 2021. Although jury selection in this case began in May 2021, section 231.7, by its express terms, applies to jury selection in criminal cases that began on or after January 1, 2022. (§ 231.7, subd. (i).) "'"'If the [statutory] language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.'"'" (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 673, quoting *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616.) Notably, the Legislature neither enacted the bill as an urgency measure effective in 2020 nor provided that the more stringent requirements would apply to jury selection beginning on or after January 1, 2021, when the bill became effective. Defendant does not argue otherwise or suggest the new law was controlling at the time of jury selection in this case; and we are not aware of any legal authority that would permit, let alone require, either the trial court or this court to disregard the plain and unambiguous language mandating application of the statute to jury selection beginning on or before January 1, 2022, in favor of an earlier application. (See *Ewing v. California* (2003) 538 U.S. 11, 28 [courts "do not sit as a 'superlegislature' to second-guess …

policy choices"]; *In re John H.* (1978) 21 Cal.3d 18, 25 ["'An appellate court ought not, by *judicial fiat*, [to] interpret the plain and unambiguous language of [a statute] as requiring anything additional to what the statute itself explicitly requires.'"].)

As previously stated, the federal and state Constitutions have long prohibited race-based discrimination in jury selection and the trial court was bound to evaluate defendant's challenge to the excusal of P.S., D.M., and T.S. based on the legal standards applicable at the time, as is this court on review. "'Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court.'" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 197–198, quoting *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Because the procedures set forth in section 231.7 were not in effect when the jury was selected in this case, we evaluate defendant's legal challenge under the traditional *Batson/Wheeler* test.

### III.    *Batson/Wheeler* Claim

#### A.    Procedural Summary

##### 1.    P.S.

Jury selection in this case involved four panels.[5] Prior to general voir dire, the trial court addressed excusals for hardship and cause, and selected certain potential jurors for questioning outside the presence of the panel based on questionnaire responses deemed "sensitive." P.S. was in panel 1. He was 33 years old and identified his race or ethnicity as Pacific Islander. He was single with no children, had been employed with the county for two years, had some college education, represented he planned to obtain a doctorate in psychology, and stated that he had a somewhat negative view of the criminal justice system based on news he read, stories he heard, and his own experience with the law. In response to questions on the form, he indicated that he or someone close to him

---

[5]    A fifth panel was required to select the alternate jurors.

7.

had been accused of a crime and he wrote "wrongfully accused, case was somewhat dismissed." Separately, he indicated that he or someone close to him had a bad experience with law enforcement and he wrote "wrongfully accused of resisting arrest."

Based on P.S.'s questionnaire responses, the trial court questioned him outside the presence of the other potential jurors. P.S. explained that he was accused of assault and battery after a bar fight in Kern County in 2011, and, in response to a series of questions from the court, he indicated the case was resolved during trial after he entered a plea to misdemeanor resisting arrest. When asked how he felt about it, he replied, "It was a learning experience." He denied he held any ill will toward law enforcement, his defense attorney specifically, or defense attorneys in general, but said, "I wish I knew the law better. I wish I had a better lawyer. I'm sure everything would have been dismissed." P.S. stated he could be fair to both sides, and he "believe[d] in fairness."

During this individual session, defense counsel did not ask P.S. any questions. The prosecutor questioned P.S. on whether his experience with the Bakersfield Police Department (BPD) would affect his judgment in this case, which also involved BPD. He said it would not and confirmed he held no ill will toward BPD officers or police officers in general.

Following general voir dire, both parties passed for cause and the prosecutor used his first peremptory challenge to excuse P.S. Defense counsel requested a sidebar, pursuant to the procedure that had been discussed with respect to *Batson/Wheeler* challenges, and the parties addressed the matter outside the presence of the jury. After defense counsel set forth the basis for his motion, the trial court found the burden had been met at the first step of the *Batson/Wheeler* analysis. The prosecutor then cited the charges brought against P.S. and stated, "He had an issue with his lawyer during the pendency of that case. The fact that he was found guilty of resisting arrest, the fact that he took the case to trial, the fact that he had an issue with his lawyer suggested to me that

[he] is a stubborn and argumentative person.  He also has zero children and based on that I exercised a peremptory challenge."

Defense counsel took issue with describing someone who exercised his constitutional right to a trial and obtained a good outcome as stubborn or argumentative, and pointed out that P.S. had expressed no hostility toward law enforcement or the criminal justice system.

The trial court stated it had its own notes and it referred the parties to P.S.'s questionnaire responses that he was wrongfully accused of a crime and had a bad experience with law enforcement due to the wrongful accusation of resisting arrest.  The court found that P.S.'s questionnaire responses and oral responses when questioned provided a basis for legitimate concern by the prosecutor, and the court concluded the excusal of P.S. was not race-based.

### 2.    D.M

D.M. was in panel 2.  He was 26 years old and identified his race or ethnicity as African-American[6] in his questionnaire.  He was single with no children, was a high school graduate with no college experience, and had been employed for two years as an associate and driver for an equipment company out of the area.  He had a neutral view of the criminal justice system.  During voir dire, he stated he worked temporary jobs prior to the equipment company, and he would not favor one side or the other in the case.

After the parties each used seven peremptory challenges, leaving only 11 jurors remaining, the trial court processed panel 3 and the record reflects panel 4 was due to report the next day.  Following voir dire, two jurors were excused for cause and based on the prosecutor's indicated intention to use his eighth peremptory challenge to excuse D.M., over defense opposition, the trial court made a record.

---

[6]    The trial court's jury questionnaires specified "African American" rather than Black.

Defense counsel pointed out that D.M. was the only remaining African-American juror, and he argued that D.M. had not expressed any views that provided a basis for excusing him and the prosecutor had asked him almost no questions. After noting that the other African-American juror had been excused for cause following a motion by the defense, the trial court found a prima facie showing at the first step.

The prosecutor stated that D.M. had long hair down to his mid-back, which, in a male juror, suggested "a willingness to defy social convention and unconventional personality." The prosecutor also noted D.M. was fairly young, had no children and, in response to a question the prosecutor asked, was "not just unenthusiastic but apathetic." The prosecutor described D.M. as leaning his head on his hand and "closing his eyes for quite some time …."

Defense counsel objected to the use of "natural black hair" to excuse someone as "bigotry," and court responded that the prosecutor cited length, not color. Defense counsel described D.M.'s hair as "a traditional style," and argued that hair length has been used to keep African-Americans off of juries and is one of the specific categories that has proven "problematic in jury selection." Counsel also argued that nothing about D.M.'s attitude or tone of voice was more or less enthusiastic than many of the other White jurors, and his age and having no children did not differ from "many of the remaining jurors." Counsel again stated that the prosecutor asked almost no questions of D.M. and, compared with other jurors, there was no nonspeculative, racially neutral reason for excusing D.M.

The trial court noted the defense had moved to excuse the other African-American juror for cause and observed that once section 231.7 applied to jury selection, the outcome might be different, but based on the questionnaire and in-court responses relied on by the prosecutor, a basis for excusal existed. The court found the defense had not met its burden of proving discriminatory animus and denied the *Batson/Wheeler* motion. The prosecutor thereafter exercised his eighth peremptory challenge to excuse D.M.

10.

Subsequently, the prosecutor exercised two more peremptory challenges and defense counsel exercised seven, at which point there were again only 11 jurors left. The court excused the jurors pending processing of the fourth panel. At that time, defense counsel requested the court make a record concerning D.M.'s hairstyle. Counsel stated it was a traditional or natural dreadlock style that was popular with many African-Americans. The court confirmed that D.M.'s hair was "quite long," down to his mid-back and was a dreadlock style. The prosecutor stated the style was braided and significantly longer than the juror he most recently excused with his 10th peremptory challenge, also based on hair length.

Defense counsel later sought reconsideration of the trial court's ruling, addressing the issue of discrimination based on hairstyle and Assembly Bill 3070. In response, the prosecutor stated his justification was based on hair length rather than hairstyle and that it was not the sole justification for excusing D.M. The court took the matter under submission, but no further discussion of the matter appears in the record.

### 3. T.S.

Finally, T.S. was in panel 4. She was 37 years old and identified herself in her questionnaire as Caucasian and African-American. She was single with a three-year-old child, had been employed for 15 years as a bus aide, and was attending community college for social work. She had a neutral view of law enforcement and had been the victim of a residential burglary. She stated neither she nor anyone close to her had been accused of a crime.

T.S. was questioned outside the presence of the other jurors about the burglary of her home. The perpetrators were caught, and she felt it was handled well. T.S. also stated that with respect to sexual assault, she had multiple friends who made bad decisions or were taken advantage of, but she did not know if any of those incidents were investigated; and she stated that her uncle was accused of sexual assault based on a relationship he had with a 17-year-old girl when he was in his mid-20's. He was

11.

prosecuted and served time in jail. She said she did not have any particular feelings about it other than that while he might have been a little too old for the girl, the girl was able to make the choice herself at that age and the issue was pushed by the girl's family. T.S. stated she was a believer in innocent until proven guilty and could be fair to both sides.

In response to questions from defense counsel, T.S. said she was a logical thinker and big on facts. As a reader, she would "rather have something in front of [her] that says what's going on rather than hear it," and she did not "go off what other people say basically because you don't know because people fabricate information." However, she said she would keep an open mind.

The prosecutor followed up on T.S.'s statement that people fabricate information and T.S. said she did not think she would have trouble making a decision based on witness testimony. Regarding her uncle, she said she did not know too much about the situation because they lived elsewhere, but the girl was underage and he served some time in jail. She felt the family pushed the issue because by appearances, the two were in a relationship.

During general voir dire, defense counsel questioned potential jurors about their ability to stand up for their opinions and to be fair. He used an example of encountering a parent with a newborn in a stroller, looking expectantly for a comment, and asked if anyone ever thought the baby was ugly. T.S. raised her hand and said she was honest and told it like it was. Counsel asked if she thought it or said it, and she responded she said it. He commented she probably did not have a lot of friends and she said, "I don't." He then followed with an anecdote about noticing how many ugly babies there were once his own wife was pregnant, but knowing he could not say anything. T.S. responded, "Why not? Be honest."

The prosecutor followed up with T.S. regarding her opinion that people fabricate things, and she explained that she worked with adults and children in different settings

12.

and some people exaggerate or fabricate things. She also indicated people lie and manipulate information to make their stories more or less believable.

After voir dire concluded, the trial court denied defense counsel's motion to excuse one juror for cause and the parties addressed potential *Batson/Wheeler* issues. Defense counsel expressed concern over the possible excusal of T.S. and the prosecutor confirmed he intended to excuse her. Defense counsel argued that T.S. was a Black woman with natural looking hair who engaged with both attorneys and said she would be open-minded and follow the law. Counsel did not believe there was a racially neutral basis to exclude her.

The prosecutor pointed out T.S. had a relative who was accused of sexual misconduct, and she believed the victim's family pushed the accusation, which had similarities to the present case. He also stated T.S. believed people fabricate information. He acknowledged she had rehabilitated herself somewhat, but noted that she brought up the issue on her own and that she said she did not like basing decisions on people's words. Finally, he found her clothing choice—a tie-dye shirt—odd for court and stated she had "a very strong personality," which he did not find to be a desirable trait in a juror.

Defense counsel argued that T.S. rehabilitated herself every time he or the prosecutor followed up with her on her statements, and she insisted she would have to hear the evidence to make a determination. He also argued that reliance on clothing was pretextual, and that the trial court refused to excuse for cause a different juror who was molested personally, while T.S. recognized her feelings regarding her family member's situation were not relevant and would base her decision in the case on the evidence.

The trial court made the record that in the present panel of 10 jurors, three identified themselves as Black while T.S. identified herself as Caucasian and African-American, and the prosecutor had indicated no interest in excusing the other three Black jurors. The court also noted there is a difference between excusals based on cause and peremptory challenges, and nothing T.S. said provided a basis to excuse her for cause.

13.

The court found that the prosecutor's use of a peremptory challenge to excuse T.S. was proper and unrelated to her race, and denied defendant's *Batson/Wheeler* motion.

Back in the presence of the jurors, the prosecutor used his 11th challenge to excuse T.S. Defense counsel exercised his 15th peremptory challenge to excuse a juror and then accepted the panel after the prosecution exercised his 12th peremptory challenge. After the prosecutor excused one more juror with his 13th peremptory challenge and the defense exercised its 16th challenge, both parties accepted the panel. Outside the presence of the jury, the prosecutor made a record that he used his 10th and 13th peremptory challenges to excuse two male jurors with long hair, both of whom the record reflects identified themselves as Caucasian.

### B.     Standard of Review

The parties agree that this case involves review at the third step of the *Batson/Wheeler* analysis.[7] (*People v. McDaniel* (2021) 12 Cal. 5th 97, 122; *People v. Krebs* (2019) 8 Cal.5th 265, 290.) As stated, "[i]n order to prevail, the movant must show it was "'more likely than not that the challenge was improperly motivated."'" [Citation.] This portion of the *Batson/Wheeler* inquiry focuses on the subjective genuineness of the reason, not the objective reasonableness. [Citation.] At this third step, the credibility of the explanation becomes pertinent. To assess credibility, the court may consider, "'among other factors, the prosecutor's demeanor; … how reasonable, or how improbable, the explanations are; and … whether the proffered rationale has some basis in accepted trial strategy."' [Citations.] To satisfy [him]self that an explanation is genuine, the presiding judge must make 'a sincere and reasoned attempt' to evaluate the prosecutor's justification, with consideration of the circumstances of the case known at that time, [his] knowledge of trial techniques, and [his] observations of the prosecutor's

---

[7]     The trial court expressly found defendant made a prima facie case as to P.S. and D.M., and, in accordance with the procedure it articulated to the parties, it impliedly found a prima facie case as to T.S.

examination of panelists and exercise of for-cause and peremptory challenges.  [Citation.]  Justifications that are 'implausible or fantastic … may (and probably will) be found to be pretexts for purposeful discrimination.'  [Citation.]  We recognize that the trial court enjoys a relative advantage vis-à-vis reviewing courts, for it draws on its contemporaneous observations when assessing a prosecutor's credibility."  (*Gutierrez, supra*, 2 Cal.5th at pp. 1158–1159, quoting & citing *Lenix, supra*, 44 Cal.4th at p. 613.)

On appeal, "[w]e review a trial court's determination regarding the sufficiency of tendered justifications with '"great restraint."'  [Citation.]  We presume an advocate's use of peremptory challenges occurs in a constitutional manner.  [Citation.]  When a reviewing court addresses the trial court's ruling on a *Batson/Wheeler* motion, it ordinarily reviews the issue for substantial evidence.  [Citation.]  [However, a] trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.'  [Citation.]  What courts should not do is substitute their own reasoning for the rationale given by the prosecutor, even if they can imagine a valid reason that would not be shown to be pretextual.  '[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.…  If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.'"  (*Gutierrez, supra*, 2 Cal.5th at p. 1159; accord, *Lenix, supra*, 44 Cal.4th at pp. 613–614; *People v. Silva* (2001) 25 Cal.4th 345, 385–386.)

### C.    Analysis

#### 1.    Trial Court's Evaluation of Justifications

We begin by observing that this case does *not* involve racial identities that raise a heightened concern that the prosecutor's challenges were racially motived.  (*People v. Battle, supra*, 11 Cal.5th at p. 774 [Black defendant, White victims, and all White jury]; *People v. Miles* (2020) 9 Cal.5th 513, 523, 531 (*Miles*) [excusal of Black jurors in case

15.

involving Black defendant accused of murdering White woman]; *People v. O'Malley* (2016) 62 Cal.4th 944, 980–981 [recognizing heightened concern may be raised where the defendant and excused juror, or victim and remaining jurors, share a racial identity].) Defendant and the two female victims are Hispanic, and the excused jurors are a male Pacific Islander, a male African-American, and a female who identified as both Caucasian and African-American. The composition of the jury sworn in, as self-identified in their questionnaires, was diverse: six Hispanics; one Pacific Islander; two African-Americans; one Caucasian; one Caucasian and African-American; and one Caucasian, Hispanic and Asian.

The prosecutor's stated justifications for excusing P.S., D.M., and T.S were facially race-neutral, and were neither unsupported by the record nor inherently implausible. (*Miles, supra*, 9 Cal.5th at p. 539.) Moreover, discussed next, the record reflects that the trial court made a sincere and reasoned effort to evaluate the justifications. (*Ibid.*)

### a. P.S.

With respect to P.S., he had been convicted of a crime, apparently by plea, which he stated he did not commit. He reported he had been falsely arrested and although he denied having any ill will toward law enforcement or the criminal justice system, he expressed a wish that he had known the law better and faulted his defense attorney. We recognize that negative experiences with law enforcement vary by degree and the passage of Assembly Bill 3070, is intended, in part, to ensure much greater scrutiny going forward. However, P.S.'s report that he was not only falsely arrested, but convicted of a crime he denied committing provided a widely accepted, race-neutral reason for exclusion under *Batson/Wheeler*. (*People v. Winbush* (2017) 2 Cal.5th 402, 436 [prior arrest and negative experience with law enforcement both race-neutral, valid basis for exclusion]; accord, *People v. Hardy* (2018) 5 Cal.5th 56, 82–83 [negative law

enforcement experience]; *People v. Lomax* (2010) 49 Cal.4th 530, 573 [arrest of juror or close relative].)

The prosecutor also described P.S. as stubborn and argumentative. Defense counsel argued against the characterization of P.S. as stubborn and argumentative, but where a prosecutor relies on demeanor and other factors not apparent on a cold record to excuse potential jurors, the trial court's rulings "are particularly difficult to second guess. Only the trial court is in a position to observe these matters. The court can hear the juror's tone and inflection and see whether a juror hesitates or struggles with particular answers in a way the record may never reveal. [Citation.] Because the 'trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes[,] … "these determinations of credibility and demeanor lie peculiarly within a trial judge's province," and "in the absence of exceptional circumstances, we [will] defer to the trial court."'" (*Armstrong, supra*, 6 Cal.5th at p. 770.)

Finally, the prosecutor mentioned P.S. did not have any children. This justification did not appear to be the primary basis for excusal, but it is supported by the record and a preference for jurors with children, which the prosecutor expressed, is not unreasonable in a case involving crimes committed against children. The trial court did not expressly comment on P.S.'s demeanor and lack of children, and as defendant observes in his reply brief, the California Supreme Court has cautioned that a "'laundry list' approach (*Foster v. Chatman* (2016) 578 U.S. __, __ [136 S.Ct. 1737, 1748]) carries a significant danger: that the trial court will take a shortcut in its determination of the prosecutor's credibility, picking one plausible item from the list and summarily accepting it without considering whether the prosecutor's explanation as a whole, including offered reasons that are implausible or unsupported by the prospective juror's questionnaire and voir dire, indicates a pretextual justification. A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in

some circumstances fatally impair the prosecutor's credibility." (*People v. Smith* (2018) 4 Cal.5th 1134, 1157–1158; accord, *Armstrong, supra*, 6 Cal.5th at pp. 781–782.) However, the record reflects that the trial court allowed the parties to make a full record, it considered the arguments, and it found the prosecutor's justifications genuine and neutral. The record does not suggest that "cherry-picking was involved here" (*Armstrong, supra*, at p. 782), and the failure to expressly consider every single factor does not, in this case, undermine the court's findings (*ibid.*).

### b. D.S.

Turning to D.S., the trial court was mindful, as are we, of the changes in the law under Assembly Bill 3070. However, those changes were not yet in effect when the jury was selected in this case, and under the traditional *Batson/Wheeler* analysis, the focus "is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924, citing *Purkett v. Elem* (1995) 514 U.S. 765, 769.) "'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons," so long as the justification is not based on race. (*Lenix, supra*, 44 Cal.4th at p. 613; accord, *People v. O'Malley, supra*, 62 Cal.4th at p. 975.) Under that test, the exercise of peremptory challenges based on hair style, appearance, body language, or gestures is permissible. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 102; *People v. Elliott* (2012) 53 Cal.4th 535, 570; *People v. Reynoso, supra*, at p. 924; *People v. Ayala* (2000) 24 Cal.4th 243, 265, fn. 2.)

The record reflects that D.S.'s hair fell to his mid-back in length, and its length, which the prosecutor considered unconventional in a man, was one of the stated justifications for excusing him. Although defense counsel disagreed, with respect to demeanor, the prosecutor also felt D.S. exhibited apathy in response to a question, rested

his head in his hand and closed his eyes for extended periods. Notably, the trial court heard the *Batson/Wheeler* motions contemporaneous to the excusal of the challenged jurors and was well positioned to evaluate the sincerity of the justifications advanced by the prosecutor. Under these circumstances, the record provides no basis for us to second guess the trial court's findings. (*Miles, supra*, 9 Cal.5th at p. 539; *Armstrong, supra*, 6 Cal.5th at p. 770.)

### c. T.S.

Finally, T.S. had a family member who served time for a sex offense case and T.S. felt the victim's family pushed the prosecution. Although T.S. stated she could be fair, the prosecutor's concern with parallels between T.S.'s uncle's case and this case was neutral and reasonable under the circumstances. Further, T.S. expressed a preference for reading rather than hearing facts and said she did not like taking people's word for things because people fabricate information. That this would create concern for the prosecutor in a molestation case that depended on jurors believing the victims' testimony is self-evident.

The prosecutor also cited T.S.'s unusual attire for court proceedings and strong personality, which he did not believe was a positive attribute in a juror. Defense counsel did not dispute T.S.'s attire and the record bears out that she was unusually and unabashedly direct; in general, not many people are inclined to inform a parent that their newborn baby is ugly, let alone comfortable doing so. As with P.S. and D.M., the record provides no basis for us to second guess the trial court's findings. (*Miles, supra*, 9 Cal.5th at p. 539; *Armstrong, supra*, 6 Cal.5th at p. 770.)

### 2. Comparative Analysis Issues

Comparative juror analysis evidence "'is one form of relevant circumstantial evidence.'" (*People v. Hardy, supra*, 5 Cal.5th at p. 77, quoting *People v. Melendez* (2016) 2 Cal.5th 1, 15; accord, *People v. Smith, supra*, 4 Cal.5th at pp. 1147–1148.) When undertaken, a court "engages in a comparison between, on the one hand, a

challenged panelist, and on the other hand, similarly situated but unchallenged panelists who are *not* members of the challenged panelist's protected group." (*Gutierrez, supra*, 2 Cal.5th at p. 1173, italics added.) "'The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor. [Citations.]' [Citation.] 'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.' [Citation.] 'At the same time, "we are mindful that comparative juror analysis on a cold appellate record has inherent limitations." [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." [Citation.]'" (*People v. Winbush, supra*, 2 Cal.5th at p. 442; accord, *People v. Woodruff* (2018) 5 Cal.5th 697, 754.)

"Pretext is established, however, when the compared jurors have expressed 'a substantially similar *combination* of responses,' in all material respects, to the jurors excused. [Citation.] Although jurors need not be completely identical for a comparison to be probative [citation], 'they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge' [citation]." (*People v. Winbush, supra*, 2 Cal.5th at p. 443, quoting *People v. DeHoyos, supra*, 57 Cal.4th at p. 107.)

In this case, the trial court was not asked to and did not conduct a comparative juror analysis, and the parties do not expressly seek one on review.**8** However, in his opening brief, defendant notes that Jurors Nos. 5798798, 5813914, and 5339832 were young, and of the three young jurors, 5798798 and 5339832 did not have children; and in their opening brief, the People point out defendant compared T.S. to Juror No. 5742839.

To the extent that defendant is advancing a comparative analysis argument with respect to D.M. and the other three young jurors, when analyzing the issue "for the first time on appeal, we need not turn a blind eye to reasons the record discloses for not challenging other jurors. 'This is so because a party legitimately may challenge one prospective juror but not another to whom the same particular concern applies. [Citation.] "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.'" [Citations.] [¶] However, 'we bear in mind that comparative juror analysis is not simply an exercise in identifying any conceivable distinctions among prospective jurors. "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." [Citation.] Rather, because the ultimate question before us concerns the prosecutor's motivations in exercising the challenge in question, we must ask whether there were any *material* differences among the jurors—that is, differences, other than

---

**8** There was only one seated juror who identified herself as Caucasian, and the record does not suggest that she and any of the excused jurors were similarly situated. As stated, the parties do not argue otherwise. (*Miles, supra*, 9 Cal.5th at p. 541 ["Comparative juror analysis is appropriately confined to the jurors [the] defendant has specifically discussed in his appellate briefing."].)

race, that we can reasonably infer motivated the prosecutor's pattern of challenges.'" (*Miles, supra*, 9 Cal.5th at pp. 543–544.)

D.M. was relatively young at 26 and had no children, no college experience, and reported a two-year work history, prior to which he held temporary jobs. As previously stated, we are unable to assess D.M.'s demeanor and body language on a cold record, but the prosecutor's justifications implicated both D.M.'s youth and lack of children, and coupled with the prosecutor's comments about apathy and body language, may well have reflected a perceived lack of life experience or maturity. Conversely, of the two seated jurors who were young and had no children, one, who identified as Hispanic, was attending college with plans to transfer to a four-year university and the other, who identified as Caucasian and Hispanic, had a degree in aerospace engineering with plans to further his education. The third young juror, who identified as Hispanic, had one child and no college experience, but planned to become a police officer. These differences are, in our view, material when viewed through the lens of the prosecutor's age, child-related, and demeanor-related justifications for excusing D.M. Furthermore, given that these three jurors did not identify themselves as Caucasian, their inclusion on the jury does not lend support to defendant's claim of discrimination against persons of color during jury selection.

With respect to T.S., Juror No. 5742839 identified herself as African-American in her jury questionnaire and we do not interpret defendant's argument as one advancing a comparative juror analysis. (*Gutierrez, supra*, 2 Cal.5th at p. 1173.) Rather, in response to the trial court's recognition that in addition to T.S., there were two other African-American jurors, defendant cited this court's decision in *People v. Collins*, which states, "We do, of course, acknowledge the prosecutor's acceptance of another Black juror in this case 'lessen[s] the strength of any inference of discrimination that the pattern of the prosecutor's strikes might otherwise imply.' (*People v. Reed* (2018) 4 Cal.5th 989, 1000.) But accepting one juror of a particular group does not necessarily mean another

22.

juror of the same group was not dismissed due to membership in the same group. There could be reasons why one juror appears favorable to the party, while the other juror is nonetheless stricken precisely because of his or her group." (*People v. Collins* (2021) 60 Cal.App.5th 540, 554.) The record in *People v. Collins*, however, is not analogous to the record here; there, the trial court applied the wrong standard of review at the first stage, the record both failed to support and contradicted the justifications advanced, and this court's independent review of the record revealed a reasonable inference of race-based discrimination in the excusal of a Black juror. (*Id.* at pp. 552–553.)

### 3. Conclusion

We are mindful that striking even a single juror based on race or ethnicity is impermissible (*Foster v. Chatman* (2016) 578 U.S. 488, 499 [136 S.Ct. 1737, 1747]; *Gutierrez, supra*, 2 Cal.5th at pp. 1157–1158), but it bears repeating that this case does not involve heightened concerns based on racial identities (*People v. Battle, supra*, 11 Cal.5th at p. 774; *Miles, supra*, 9 Cal.5th at p. 531; *People v. O'Malley, supra*, 62 Cal.4th at pp. 980–981). Further, the prosecutor's justifications for excusing P.S., D.M., and T.S. were facially neutral, grounded in longstanding *Batson/Wheeler* precedent and, critically, neither inherently implausible nor contradicted by the record. (*Miles, supra*, at p. 539.) As explained, "'"[w]e review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges '"with great restraint."' … So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal."'" (*Ibid.*) The record reflects that the trial court did so here, contemporaneous with each challenged juror's excusal, or anticipated excusal. The trial court was well positioned to observe the jurors and the parties in evaluating the prosecutor's use of peremptory challenges, and to the extent the court could have made a fuller record on the demeanor or gesture-related justifications, the record was nevertheless sufficiently developed to entitle the court's findings to deference under the *Batson/Wheeler* analysis.

(*Miles, supra*, at pp. 540–541.)  Accordingly, we conclude that defendant has not met his burden of demonstrating that the trial court erred when it found he failed to prove purposeful discrimination in the excusals of P.S., D.M., and T.S., and we affirm.

## DISPOSITION

The judgment is affirmed.


 

 

MEEHAN, J.

WE CONCUR:


FRANSON, Acting P. J.


PEÑA, J.